454 A.2d 937

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Keith ZETTLEMOYER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 25, 1982.
Decided Dec. 30, 1982.
Reargument Denied Feb. 7, 1983.

20

Robert N. Tarman, Chief Public Defender, for appellant.

William A. Behe, Deputy Dist. Atty., Richard Lewis, Dist. Atty., Leroy Zimmerman, Atty. Gen., Marion E. MacIntyre, Asst. Atty. Gen., for appellee.

24

Judah Labovitz, A.C.L.U., amicus curiae.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION

LARSEN, Justice.

This appeal raises the issue of the constitutionality of the death penalty which sentence was imposed by a jury upon Keith Zettlemoyer, appellant, pursuant to the procedures set forth in section 9711 of the Sentencing Code, 42 Pa.C.S.A. § 9711.[1] For the reasons stated herein, we affirm appellant's conviction for murder of the first degree, find the sentencing procedures to be valid under both the federal and state constitutions, and uphold the sentence of death.

Appellant was arrested on October 13, 1980 and charged with criminal homicide for the shooting death of Charles DeVetsco. The trial was conducted in the Court of Common Pleas of Dauphin County before the Honorable John C. Dowling. On April 24, 1981, a jury convicted Keith Zettlemoyer of murder of the first degree, and, following a separate sentencing proceeding, that same jury pronounced a sentence of death. Following denial of his post-verdict motions by a court en banc, the case was automatically appealed to this Court. 42 Pa.C.S.A. § 9711(h)(1) and § 722(4).

As established by the Commonwealth's uncontradicted testimony and the reasonable inferences raised therefrom,

1. This case marks the second occasion this Court has had to review the constitutionality of these procedures adopted by the General Assembly for imposing the death penalty. *See Commonwealth v. Story,* 497 Pa. 273, 440 A.2d 488 (1981), reargument denied on February 5, 1982. The issue remains unresolved, however, as four Justices of this Court have determined that the sentencing procedures adopted by the Act of September 13, 1978 (formerly 18 Pa.C. S.A. § 1311, transferred to 42 Pa.C.S.A. § 9711 by Act of October 5, 1980, P.L. 693, No. 142) were not intended by the legislature to be applied to Stanton Story's conviction for a murder which occurred in 1974. Opinion of the Court per Roberts, J., joined by O'Brien, C.J. and Wilkinson, J.; concurring opinion by Nix, J.; dissenting opinion by Larsen, J., joined by Flaherty and Kauffman, JJ.

the facts demonstrate a "carefully planned, brutally carried out, cold-blooded execution of a young man scheduled to testify against the [appellant] in a pending felony trial." Opinion of the Court of Common Pleas of Dauphin County, En Banc, October 16, 1981, denying appellant's post-verdict motions. (Slip opinion at 1.) The evidence discloses the following.

In the early morning hours of October 13, 1980, two officers of the Conrail Police Department were on routine patrol in an unmarked car in the Harrisburg railroad yards when they heard gunfire (two shots) coming from a nearby area. The officers proceeded to the area—an isolated, overgrown, unlit area used for dumping trash. When they arrived, the officers observed a 1967 Ford van parked on a dirt access road leading back to a creek and overgrown with bushes. Hearing rustling noises in the bushes in front of the van, the officers ordered the person making the noise to come out.

At this point, appellant emerged from the bushes holding a .357 magnum Smith and Wesson revolver in his right hand and a flashlight in his left. Appellant exclaimed "What's the matter, guys? I was only shooting rats." Officer Gregory W. Benedek replied "At 4:00 o'clock in the morning?", to which appellant responded "Yes, I do it all the time." The officers ordered appellant to drop his gun which, after hesitating several seconds, he finally did, at which point he was secured.

Sergeant William J. Houtz then retraced appellant's path into the woods and located the still trembling body of the victim, Mr. DeVetsco, lying face down. Charles DeVetsco had been shot four times, twice in the neck with a .22 caliber weapon and twice in the back with the .357 magnum in appellant's hand. The victim had been shot with a .22 caliber weapon while in the van (as indicated by several blood-soaked items, two spent .22 caliber bullet casings, and the weapon, all found in the van), handcuffed, and dragged from the van into the bushes where the fatal shots were fired (as indicated by drag marks and blood drippings).

When appellant emerged from the bushes, he was dressed in dark clothing, wearing dark gloves, and was heavily armed. Found on his person by officers of the Harrisburg Police Department who had quickly arrived on the scene, as well as by Conrail officers, were a hunting knife, 41 rounds of semijacketed hollow point .357 magnum ammunition (more deadly than "normal" ammunition), a shoulder holster, a tear gas cannister, penlight and two handcuff keys.

All of the victim's wounds were consistent with the shooting having been done while the victim was lying face down. The cause of death was massive hemorrhaging of the heart which had been penetrated by the .357 magnum bullets.

The Commonwealth also demonstrated that the victim had worked a short while with the appellant at a retail store and had been scheduled to appear as a witness on behalf of the Commonwealth, and against appellant who was a defendant in a criminal proceeding in Snyder County. During the jury selection portion of those proceedings on October 6, 1981, the Commonwealth indicated, in appellant's presence, that the prosecution intended to call Charles DeVetsco. The trial of that matter was to have begun on October 21, 1981.

 Based upon the Commonwealth's uncontradicted evidence, it is clear that the victim was shot first with the .22 caliber weapon, dragged from the van into the deserted woods, and summarily executed by the appellant by two shots of the .357 magnum in order to prevent his (the victim's) testifying against appellant at the Snyder County criminal proceedings. The evidence is, thus, sufficient to establish appellant's guilt of murder of the first degree [2] beyond a reasonable doubt.[3]

**2.** "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a) (Supp.Pamphlet 1982–83).

**3.** While appellant does not contest the sufficiency of the evidence to sustain a conviction of murder of the first degree, this Court will nevertheless review for sufficiency. In cases in which the death penalty is imposed, the Sentencing Code, 42 Pa.C.S.A. § 9711(h), requires this Court to review the evidence to determine whether it supports the finding of an aggravating circumstance, and to deter-

## I. VALIDITY OF THE CONVICTION OF MURDER OF THE FIRST DEGREE

At trial, appellant admitted general criminal culpability for murder (*see* Notes of Testimony (N.T.), April 20, 1981, at 366; opening argument of defense counsel), but offered a defense of diminished capacity which defense was first recognized in this Court in *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976), in an attempt to reduce the degree of guilt from murder of the first to murder of the third degree. (N.T. April 24, 1981 at 788; closing argument of defense counsel). Several of appellant's assertions of trial error are related to this defense.[4]

In *Walzack*, this Court sustained as relevant the admission of certain psychiatric testimony to the effect that a pre-frontal lobotomy negated the required *mens rea* for

mine whether the sentence of death was the product of "passion, prejudice or some other arbitrary factor", and whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases." To properly perform this statutory obligation, and because "imposition of the death penalty is irrevocable in its finality" and warrants, therefore, the relaxation of our waiver rules, *Commonwealth v. McKenna*, 476 Pa. 428, 437–41, 383 A.2d 174 (1978), this Court shall review, in death penalty cases, the sufficiency of the evidence to sustain a conviction of murder of the first degree. *See* note 19, *infra*.

4. Appellant also asserts numerous other instances of trial and pre-trial error which, having carefully reviewed the record and applicable precedent, we find to be without merit. These assertions of error are: 1) the lower court erred in ordering defense counsel to furnish, prior to trial, the report of the defense psychologist; 2) the court erred in denying appellant's motion to suppress all of the evidence found in a warrantless search of the van operated by appellant; 3) the court erred in denying certain requested questions for voir dire of prospective jurors; 4) the court erred in denying appellant's objection to exclude all Commonwealth questions for voir dire concerning the death penalty; 5) the court erred in admitting a photograph of the corpse of the victim; 6) the court erred in overruling defense counsel's objections to testimony concerning certain medical tests not actually conducted by the witness; 7) the court erred in denying requested points for charge regarding diminished capacity and voluntary drugged condition so as to negate specific intent; and 8) the court failed to cure certain allegedly prejudicial remarks made by the prosecutor in his closing argument concerning the defense psychologist's testimony. We perceive no jurisprudential benefits to be achieved by discussion of these issues in this opinion.

28

murder of the first degree, namely, that the actor had formed the specific intent to kill. This Court has quite recently explained that diminished capacity is an extremely limited defense, *Commonwealth v. Weinstein*, 499 Pa. 106, 451 A.2d 1344 (1982), and that *Walzack* stands only for the proposition that "psychiatric testimony which speaks to the legislatively defined state of mind encompassing a specific intent to kill is admissible." *Id.*, 499 Pa. at 113, 451 A.2d at 1347. Thus, psychiatric testimony is irrelevant, under *Walzack*, unless "it speaks to mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent." *Id.*, 499 Pa. at 114, 451 A.2d at 1347.[5] This Court carefully examined the proferred psychiatric testimony in *Weinstein* and determined that it was no more (nor less) than testimony as to that appellant's irresistable impulses or inability to control himself, and not to his ability to formulate and carry out a plan or design, and was, therefore, irrelevant and inadmissible on the issue of appellant's specific intent to kill. *Id.*, 499 Pa. at 119, 451 A.2d at 1350.

■ Essentially, as will be seen, such was also the quality of the evidence produced in the instant case. Appellant offered the testimony of nine lay witnesses and a psychologist, Dr. Stanley Schneider, to support his assertion that appellant had a "schizoid personality with paranoid features." (N.T. April 23, 1981 at 714–15). After Dr. Schneider had testified *at length* as to the numerous tests he had made on appellant and had given his diagnosis of "schizoid personality with paranoid features," defense counsel asked the following question: "[W]ith a reasonable degree of medical certainty, was the defendant's mental illness of such an intensity at that time, at the time of the killing, that he was not mentally capable of fully forming the specific intent

5. This author continues to express disapproval of the use of psychiatric testimony in such cases unless the testimony is relevant to a determination of sanity under the M'Naghten rule, for the reasons expressed in my concurring opinion in *Commonwealth v. Weinstein, supra* and in Justice McDermott's concurring memorandum in that case.

which is required for a willful, deliberate and premeditated act?" (N.T. April 23, 1982 at 725). The court sustained the Commonwealth's objection to this question on the grounds that no foundation had been laid for the psychologist to express such an opinion and that the evidence that had been introduced was irrelevant to the question of whether appellant had the capability to form the specific intent to kill. This ruling was correct.

Initially, we reject appellant's contention that certain language in two post-*Walzack* cases expressed an intention on the part of this Court to extrapolate the dimensions of the defense of diminished capacity. In *Commonwealth v. Sourbeer*, 492 Pa. 17, 422 A.2d 116 (1980), three Justices of this Court found that the trial court had not erred in giving a jury instruction on diminished capacity which included the statement "[i]f you find the defendant has a diminished capacity due to his *personality disorder*, this diminished capacity may be considered by you . . ." *Id.*, 492 Pa. at 31 n. 2, 422 A.2d at 121 n. 2. As *Commonwealth v. Weinstein, supra,* instructs, this jury charge gave far too liberal an interpretation of *Walzack* and, accordingly, was eminently more favorable to the appellant than a correct charge would have been. *See Commonwealth v. Hamilton,* 459 Pa. 304, 329 A.2d 212 (1974), *cert. denied* 420 U.S. 981, 95 S.Ct. 1411, 43 L.Ed.2d 663 (1974). Accordingly, the statement by the plurality in *Sourbeer* that the jury instruction was "perfectly proper" was only intended to hold that any error was beneficial to the appellant and cannot be read to imply that a "personality disorder" will suffice to demonstrate an accused's diminished capacity.

Similarly, in *Commonwealth v. Brantner,* 486 Pa. 518, 406 A.2d 1011 (1979), the defense had offered psychiatric testimony which indicated that the appellant therein had a "schizoid personality and was paranoid." We did not discuss or consider the relevance of that testimony to the defense of diminished capacity, but, rather, simply stated:

The prosecution offered appellant's own statement reflecting a consciousness of the consequences of his own acts,

30

and also produced lay testimony going to establish appellant's sanity. Viewing all of the evidence in a light most favorable to the Commonwealth (citation omitted), *we find the evidence more than sufficient to permit the jury to reject any suggestion of diminished capacity and to find that appellant intended to cause the death of his victims.* (citation omitted; emphasis added).

Obviously, *Brantner* cannot be read to support appellant's claim that a diagnosis of "schizoid personality with paranoid features" is relevant to the issue of a defendant's mental capacity to form the specific intent to kill. The trial court considered both *Sourbeer* and *Brantner* and quite properly discarded the notion that personality disorders or schizoid/paranoid diagnoses are relevant to a *Walzack*/diminished capacity defense. *See* N.T. April 23, 1981 at 726–28. Judge Dowling observed:

Upon reflection I do not believe I should have allowed the testimony [of Dr. Schneider]. I think I have allowed [defense counsel] an extraordinary latitude in describing what is not an untypical criminal personality and I can see no basis for this expert coming to the conclusion that you have asked him. . . . How he could come to that conclusion even though it is only an opinion, I think all of his testimony could well be stricken. . . . he has simply described a relatively typical criminal personality.

N.T. at 725–26. An analysis of the defense testimony proves the accuracy of Judge Dowling's observations.

■ The lay witnesses who came in contact with the appellant on the morning after the homicide or within a few days of the incident, testified that appellant's eyes looked "glassy" or "glazed", that he "stared" a lot, that he was "like in a trance", that he appeared sleepy and unstable, and that he acted like he "could have been" under the influence of drugs or alcohol.[6] None of this testimony is surprising

6. These witnesses were the district justice before whom appellant was arraigned and his secretary, and various guards and social workers, some in the field of mental health, who observed appellant at the Dauphin County Prison. Appellant was placed in an isolation,

considering that most of these observations were made after appellant had been awake all night in police custody following what must have been a rather exhausting execution, was without the eyeglasses which he normally wore, and was in an atmosphere of incarceration which can never be described as a pleasant experience. Moreover, these witnesses testified that appellant understood the proceedings, his rights, signed his name when asked, and responded, albeit tersely, to orders. The testimony of these witnesses has *absolutely no bearing* on whether, at the time of the killing, appellant had the mental capacity to form the specific intent to kill, especially in light of the unanimous testimony of all of the officers at the scene of the crime that appellant was responsive, conversed rationally and appeared normal until after appellant left the scene in a police cruiser.[7]

 Also irrelevant to appellant's ability to form the requisite *mens rea* for an intentional killing was the testimony of appellant's grandmother, Mrs. Thelma A. Zettlemoyer (N.T. at 651–57) and mother, Mrs. Donna Zettlemoyer (N.T. at 657–90). Basically, their testimony profiled appellant as a temperamental, spoiled, anti-social young man (appellant was 25 years old at the time of trial) who could not maintain a job or a relationship with women, and who seemed very depressed in the weeks preceding the shooting of appellant's

padded cell, as the prison officials tend to err on the side of caution regarding a newly admitted prisoner's safety where that prisoner exhibits *any* signs of instability. *See* N.T. pp. 566–651.

7. Seven officers testified in the Commonwealth's case in chief that appellant's behavior was normal and rational at the scene. N.T. 367–510. Officer Gregory Benedek said he and appellant had a brief conversation and that the latter still was trying to convince him that appellant had only been shooting rats (this was before Officer Houtz had found the victim). N.T. at 393–94. The officer who "read appellant his rights" testified that appellant understood and responded to five questions and did not appear to be disoriented in any way. N.T. at 500. It was not until other officers were "booking" appellant that he began to exhibit any signs of distress. Testimony of Officers Richard Kahl and Melvin Austin, N.T. at 501–510. (At this time, appellant appeared to faint and was taken to a hospital where blood tests were administered and proved negative regarding drugs or alcohol, except for the presence of some antihistamines and a sedative.)

one-time friend, Charles DeVetsco. Once again, this testimony sheds *no light whatsoever* on appellant's mental capacity to premeditate, deliberate and form the specific intent to kill.

Finally, the defense presented Dr. Schneider, a clinical psychologist who testified extensively over the Commonwealth's objections. Dr. Schneider was given wide latitude in describing his observations and the methods he used to arrive at his diagnosis. Some of his findings were that appellant was not psychotic, possessed average intelligence (I.Q. 98) and scored extremely high in the "deception area" (i.e., he attempted to deceive the tester in at least one of the psychological tests that Dr. Schneider administered.) N.T. at 711, 708, 712–13, 709. Asked to give his "final diagnosis", Dr. Schneider replied: "As a result of the testing, the interview and my conversations with family members, my diagnostic impression is that we have a schizoid personality with paranoid features—well, paranoid and inadequate features." To clarify this diagnosis, Dr. Schneider explained his jargon thusly, N.T. at 715–16:

Answer: A personality disorder is a lifelong set of rather established, well entrenched personality traits. A schizoid personality is an individual who is eccentric, may be referred to as queer in terms of, not his sexual preferences but his behavior, shy, oversensitive, usually detached, seemingly unemotional in the face of upsetting events and experiences. There is typically a defect in the capacity to form social relationships. There is little or no desire for social involvement. They are usually loners. They have few close friends, reserved, withdrawn, reclusive. They usually pursue solitary interests and jobs, often humorless, dull, cold and aloof. These are typical descriptors of a schizoid personality.

Question: Do you feel specifically that those symptoms or those characteristics that you have just named apply to Mr. Keith Zettlemoyer?

Answer: Yes.

Question: Now, moving on to the term paranoid, would you please describe for the ladies and gentlemen of the jury what that means and what significance to your findings that word means?

Answer: In lay terms it would be a belief that, or an indication that people are out to harm you or hurt you, get you, essentially.

Finally, Dr. Schneider applied his psychological labels to appellant and rendered the following observations:

I also mentioned that Mr. Zettlemoyer is an inadequate person which essentially means that he was unable, as I indicated, to deal with the normal pressures, demands, responsibilities of daily living. He has never completed anything to my knowledge successfully, whether it be socially, personally or vocationally. He has failed and I believe that his reaction *over this period of time resulted in, well, what I refer to as a pressure cooker syndrome, pressure mounting up. If you don't have a release valve it will blow and that's where I believe that the emotional disturbance, in addition to the personality disorder, may have resulted in the behavior.*

\* \* \*

I find that Mr. Zettlemoyer is a pampered, doted upon, catered to, in simple terminology spoiled brat who *figured out how to get what he wanted, either directly or by manipulating or controlling the situation* to get what he wanted his entire life and I believe that *faced with the number of stresses that he had to deal with that he could not cope with,* and he decompensated.

N.T. at 719–21. (emphasis added) (*See also* defense counsel's closing arguments focusing on this asserted "pressure-cooker syndrome". N.T. at 773.)

■ It should be apparent from the foregoing summary of the "defense", that the psychiatric/psychological testimony of Dr. Schneider falls well short of the objective quantum of reliability and relevance which this Court requires, *Commonwealth v. Stasko,* 471 Pa. 373, 383–85, 370 A.2d 350, 355–56 (1977), *quoting Commonwealth v. McCusker,* 448 Pa. 382,

388–89, 292 A.2d 286 (1972), before such testimony will be deemed admissible on the issue of whether appellant had the mental capacity to form the specific intent to kill. Moreover, the "defense" offered in this case is simply an attempt to once again foist the "irresistible impulse" concept upon this Court under different nomenclature, an attempt which we have consistently rejected and will continue to resist. See, e.g., Commonwealth v. Tomlinson, 446 Pa. 241, 284 A.2d 687 (1971) wherein we stated:

Defendant in the instant case makes the same contentions as were made in the aforesaid cases, but instead of calling himself a mental defective or a sexual pervert, or some kind of psychopath, or that he had an irresistible impulse, he contends that his is a case of "diminished responsibility." By whatever name psychiatrists, or doctors or lawyers call it, an inability to control one's self under certain circumstances is legally insufficient to justify an acquittal of murder, or a reduction of a first degree murder killing to [a murder of a lesser] degree.

\* \* \*

The doctrine of "irresistible impulse" or in the modern psychiatric vernacular "inability to control one's self", whether used to denote legal insanity, or as a device to escape criminal responsibility for one's acts or to reduce the crime or its degree, has always been rejected in Pennsylvania.

\* \* \*

Such a theory or philosophy would soon transfer the punishment of criminals from Courts to psychiatrists and would inevitably result in a further breakdown of law enforcement and eventual confusion and chaos. Fortunately our cases are opposed to such an undesirable result. Id., 446 Pa. at 252–54, 284 A.2d at 696 (citations and references omitted).

Thus, in this case as in Commonwealth v. Weinstein, supra, appellant's "expert was unable to speak to the issue of specific intent, recognizable by the law, and was unable logically to relate [appellant's] underlying disease or mental

defect to his uncontrollable act. [Appellant] was clearly able to formulate and carry out a plan or design." 499 Pa. at 118, 451 A.2d at 1350. Accordingly, the trial court did not err in refusing to allow Dr. Schneider to express his opinion as to whether appellant possessed sufficient mental capacity to form the specific intent to kill, especially in light of the fact that the psychologist had already testified extensively and the jury was in a position, under proper instructions, to draw its own conclusion as to this issue.[8]

Appellant alleges, however, that the jury did not receive proper instructions. As stated by the court en banc, the appellant "asserts here that the court's charge to the jury on what constituted a defense of diminished capacity left it with the impression that it was not proven in the instant case. As is usual in such complaints, isolated portions of the charge are extracted with materially qualifying sentences or phrases conveniently omitted." Slip opinion at 13. The entire charge on diminished capacity was stated as follows, with the portions identified by appellant as objectionable underscored:

> The defense in this case is diminished capacity. That is the term. It is a relatively new term in the law of Pennsylvania. It evolved out of a case, a Pennsylvania decision by the Supreme Court of Pennsylvania in 1976 where, in that case a psychiatrist, they offered the testimony of a psychiatrist that the deceased—or the defendant had had a lobotomy and didn't possess the requisite intent. The Court held that that evidence should have been admitted. I am not saying that it has to be limited

---

**8.** The Commonwealth objected, at the outset, to Dr. Schneider's qualifications to testify as an expert witness on the issue of diminished capacity. We agree with the Commonwealth that, given the narrow application of *Walzack* as explained in *Weinstein,* the testimony of the medically trained psychiatrist is preferrable to that of the psychologist who has received no education in medicine. However, we express no opinion at this time as to the competence of a psychologist to testify as to diminished capacity. *See Commonwealth v. Williams,* 270 Pa.Super. 27, 410 A.2d 880 (1979), *allocatur denied* March 12, 1980.

to that type of case but that's where it came into the law, this theory of diminished capacity.

What it is, it is a contention that because of the mental capacity of the defendant he did not have the ability to form a specific intent to kill at the time he committed the crime. That is what they are saying. . . .

You must keep this in mind, that we cannot use, when we are talking about something that prevents the defendant from having a specific intent to kill. It is not an excuse for antisocial behaviour. It is not something that excuses someone who is spoiled or pampered or someone who loses their control or judgment under stress, somebody who has a poor life style, is a loser in life, somebody who reacts to stress by violence; that is not what we are talking about. If you are satisfied and the Commonwealth has proven to you beyond a reasonable doubt that he had a specific intent to kill, the defense says because of all these things, because of his personality, he could not form the specific intent to kill. That is what diminished capacity means. He did not have the capacity to form the intent to kill. It is not an excuse for a personality disorder or someone who is antisocial, but it is evidence, and you have heard it from family, you have heard it from a psychologist and you take that evidence into account in deciding the issue as to whether at the time the crime was committed, at the time Mr. DeVetsco was murdered, the defendant had a specific intent to kill him. That is the issue and that is where the evidence becomes relevant.

\* \* \*

The defense is that because of his life style, or his personality, and you have heard all about that, that he lacked the specific intent to kill. Well, if he didn't have it at the time he committed the crime, the specific intent to kill, then he can't be guilty of murder in the first degree.

\* \* \*

The burden of proof rests with the Commonwealth to prove each element of the crime beyond a reasonable doubt. Therefore, in order to meet the burden of proof

required for murder of the first degree, the Commonwealth must prove beyond a reasonable doubt that the killing was willful, deliberate and premeditated and that at the time of the killing the defendant was not acting with a diminished capacity.

\* \* \*

The mere fact that the Commonwealth produced evidence tending to show that the defendant may have had a motive to kill or that he planned and premeditated the killing does not necessarily eliminate the defense of diminished capacity. If you have a reasonable doubt that during that time period in which the defendant planned and premeditated that he suffered a mental illness, defect or abnormality which prevented him from fully forming the specific intent required for murder of the first degree then you must find him not guilty of first degree murder. I affirm that but again, I call your attention to the fact that the defense of diminished capacity is whether or not—the issue is did he possess sufficient mental capacity to form the specific intent required at the time that he committed the killing but, of course, the background may be evidence on that. Now, I commented to you and whatever I said is on the record, I don't recall it verbatim, that diminished capacity does not mean somebody who was antisocial or who was prone to violence or who was temperamental and can't control himself and can't react to stress. I say that again, that should be pretty obvious. However, I am not saying that you should disregard the evidence about the defendant's personality. It is relevant, you may use it as relevant as to whether or not at the time he killed DeVetsco, he had the specific intent to kill.

I also mentioned the case in which this doctrine of diminished capacity came into the law of Pennsylvania and I mentioned to you that it involved an offer of psychiatric testimony concerning that the defendant had a lobotomy. Now, I didn't mean that to say that's the type of case that you have to have, such an extreme case. There have been since then two other cases that I know of

and they did not involve this type of illness. I don't recall what they did, what the testimony was but I merely gave you that historically just to show you how it started. N.T., April 24, 1982; court's charge to the jury.

In viewing the charge in its entirety, as we must, *Commonwealth v. Woodward*, 483 Pa. 1, 4, 394 A.2d 508 (1978), it is evident that the jury was adequately instructed on the defense of diminished capacity. Appellant complains that the underscored portions of the charge and the court's use of such phrases as "inability to deal with stress," "loser in life," "spoiled and pampered," "antisocial personality," "personality disorder," etc., were selected parts of defense testimony and did not correctly and fairly convey the appellant's defense." Brief for appellant at 19.

This complaint is unfounded. Appellant totally isolated these terms from the charge as a whole. The terms were also fully and properly explained in the language of diminished capacity to form the specific intent (premeditation, deliberation) to kill, and were, contrary to appellant's contention, fair and accurate portrayals of appellant's defense as can readily be seen in the testimony of Dr. Schneider as well as in the closing argument of defense counsel.[9]

**9.** Representative excerpts from defense counsel's closing remarks include the following:

There is evidence of planning, but the person who planned this crime was a sick person. He was a person who was mentally ill.

\* \* \*

There's two ways to look at the District Attorney putting on that evidence. You are probably saying to yourselves, "My God, look at this guy, he was armed to death, he planned it." Now, I am saying to you that that is evidence of a person who is sick.

\* \* \*

The defense is, we heard about this pressure cooker effect. These stresses were building up on him.

\* \* \*

You grow older, you go out to work, your responsibilities start to build and you know some people just can't handle that. That's what happens when people have nervous breakdowns.

\* \* \*

[A]ll these problems that he had, if you look, if you consider the way these stresses were building up inside of him to the point where the man was really driven to a point of absolutely no

The *entire* defense was infested with the language of irresistible impulse and the court was wise to inform the jury which facts did *not* bear upon the defense of diminished capacity. As this Court explicitly stated in *Commonwealth v. Neill,* 362 Pa. 507, 514, 67 A.2d 276, 280 (1949):

> Certainly neither social maladjustment, nor lack of self-control, nor impulsiveness, nor psycho-neurosis, nor emotional instability, nor chronic malaria, nor all of such conditions combined, constitute insanity within the criminal conception of that term.

*And see Commonwealth v. Weinstein, supra* 499 Pa. at 121, 451 A.2d at 1351 (McDermott, concurring memorandum). Neither do these conditions bear upon the narrow defense of diminished capacity. In fact, the court would not have committed error in ruling, as a matter of law, that appellant had failed to produce sufficient evidence of diminished capacity and had, therefore, refused to charge on the issue. *See Commonwealth v. Hughes,* 480 Pa. 311, 389 A.2d 1081 (1978) *citing Commonwealth v. Brown,* 462 Pa. 578, 342 A.2d 84 (1975). *See also Commonwealth v. Weinstein, supra* (psychiatric testimony, later introduced at sentencing hearing, properly excluded from guilt stage of proceedings as it was held to be irrelevant to defense of diminished capacity).

II. VALIDITY OF THE DEATH PENALTY IMPOSED PURSUANT TO SECTION 9711 OF THE SENTENCING CODE

In *Commonwealth v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972), this Court recognized that under *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Pennsylvania's then existing capital punishment statute was unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution, and so declared invalid the Act of June 24, 1939, P.L. 872 § 701, *as amended* 18 P.S. § 4701. In apparent response to the void in Pennsylvania law regarding imposition of a death penalty engendered by *Bradley,* the General Assembly in 1972 adopted section 1102

judgment, even if he was responsible for some of those stresses, the fact is they were there.
N.T. April 23, 1974 at 772–87.

of the Crimes Code which merely stated "[a] person who has been convicted of murder of the first degree shall be sentenced to death or to a term of life imprisonment." *Commonwealth v. McKenna,* 476 Pa. 428, 435, 383 A.2d 174, 178 (1978). As it was "manifest that in no way could § 1102 have been designed to cure the constitutional infirmities of the Act of 1939 . . .", it seemed that "§ 1102 had no purpose other than to provide some legislative authority for the imposition of a death sentence until the General Assembly could formulate an adequate response to the implications of the *Furman* decision." *Id.*

In 1974, the legislature enacted section 1311 of the Sentencing Code, 18 Pa.C.S.A. § 1311, Act of March 26, 1974, P.L. 214, No. 46, in an attempt to comply with the *Furman* and *Bradley* decisions. This attempt failed. While section 1311 did provide sentencing procedures intended to channel the jury's discretion (and thus avoid the danger of the death penalty being imposed in a wanton and freakish, arbitrary and capricious manner, *Furman v. Georgia, supra* 408 U.S. at 310, 92 S.Ct. at 2762 (Stewart, J., concurring), at 313, 92 S.Ct. at 2764 (White, J., concurring), and at 256–57, 92 S.Ct. at 2735–2736 (Douglas, J., concurring)), it went too far in excluding from jury consideration evidence pertaining to the individual history and character of the offender. *Commonwealth v. Moody,* 476 Pa. 223, 231, 382 A.2d 442 (1977). Accordingly, this Court held, based upon *Furman* and the 1976 quintet of same-day United States Supreme Court decisions,[10] that:

> [I]n our view, in order to protect a defendant from cruel and unusual punishment in a capital case, it is now necessary both that the aggravating circumstances that will justify the imposition of the death penalty be clearly defined for the sentencing authority, *and* that the sentenc-

10. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

ing authority be allowed to consider whatever mitigating evidence relevant to his character and record the defendant can present.

On September 13, 1978, in yet another attempt to adopt a constitutionally valid procedure by which capital punishment could be inflicted, the General Assembly enacted the current sentencing procedures set forth at section 9711 of the Sentencing Code, 42 Pa.C.S.A. § 9711,[11] pursuant to which appellant was sentenced to death. These procedures retain the split-verdict provisions of the previous acts by which, if a jury returns a verdict of murder of the first degree, a separate sentencing proceeding is then held before the same jury panel at which both sides may present arguments and additional evidence relative to the circumstances of the offense and the history and character of the defendant. § 9711(d).[12] The court then instructs the jury on the aggravating circumstances specified in subsection (d)[13], mitigating

11. Formerly 18 Pa.C.S.A. § 1311, transferred to chapter 97 of the Judicial Code, 42 Pa.C.S.A. § 9711, by § 401(a) of the Act of October 5, 1980, P.L. 693, No. 142.

12. If the defendant has pleaded guilty or has waived a jury trial, a jury may nevertheless be impaneled for the sentencing proceeding. § 9711(b).

13. The aggravating circumstances, which must be proved by the Commonwealth beyond a reasonable doubt, are limited to the following:

(1) The victim was a fireman, peace officer or public servant concerned in official detention as defined in 18 Pa.C.S. § 5121 (relating to escape), who was killed in the performance of his duties.

(2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or has conspired to pay or be paid by another person for the killing of the victim.

(3) The victim was being held by the defendant for ransom or reward, or as a shield or hostage.

(4) The death of the victim occurred while defendant was engaged in the hijacking of an aircraft.

(5) The victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses.

(6) The defendant committed a killing while in the perpetration of a felony.

42

circumstances specified in subsection (e) [14], the respective burdens of proof as to these circumstances, and the weighing process to be performed. § 9711(c). The jury must return a verdict of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. § 9711(c)(1)(iv). In all other cases, the jury must return a verdict of life imprisonment. In either event, the jury is required to set forth its findings in writing on a form designated by the court. § 9711(f).

Automatic review by this Court is provided. § 9711(h)(1). In addition to our authority to correct errors at trial, the

(7) In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim to the offense.

(8) The offense was committed by means of torture.

(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

(10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

14. Mitigating circumstances must be proven by the defendant by a preponderance of the evidence, and include the following:

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

statute also requires this Court to review the sentence of death, which shall be affirmed unless it is determined that the sentence was the product of passion, prejudice or any other arbitrary factor, that the evidence fails to support the finding of an aggravating circumstance, or that the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the circumstances of the offense and the character and record of the defendant. § 9711(h)(3)(i–iii).

It is apparent that, by this Act, the General Assembly has diligently attempted to perform the delicate balance required by the federal and state constitutions as interpreted by the United States Supreme Court and by this Court. Section IIB will discuss the success of these efforts. Section IIA addresses appellant's non-constitutional arguments concerning the validity of his sentence.

## IIA. VALIDITY OF SENTENCE—NON–CONSTITUTIONAL ISSUES

Appellant first contends that the Commonwealth has failed to meet its burden of proving an aggravating circumstance beyond a reasonable doubt. 42 Pa.C.S.A. § 9711(c)(1)(iii) and (h)(3)(ii). The only aggravating circumstance identified by the Commonwealth, and found by the jury, was "[t]he victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses." 42 Pa.C.S.A. § 9711(d)(5).[15]

Appellant argues that the Commonwealth failed to prove beyond a reasonable doubt that he had killed Charles DeVetsco in order to prevent him from testifying at a criminal proceeding. Appellant suggests that, since Mrs. Donna Zettlemoyer had testified that the victim and her son had been friends, such "friendship" gives "rise to an equally

15. On the verdict slip, the jury had hand-written that the aggravating circumstance "is the murdering of a prosecution witness to prevent testimony in a felony case".

speculative inference that the slaying was primarily motivated by other factors—e.g., betrayal, mistrust, etc.—and not to prevent testimony against the appellant". Brief for appellant at 70. This suggestion evaporates when exposed to the record. *All* of the evidence at trial and at the sentencing hearing raised the singular inference that the killing was motivated by appellant's desire to prevent the victim from testifying in the Snyder County criminal proceedings. Not one iota of evidence can be read to raise an inference of another purpose—surely not the testimony of appellant's mother that at one time appellant and the victim were "friends". In the absence of a confession or admission by the actor, purpose and intention will, of necessity, require proof by circumstantial evidence and inferences therefrom. *E.g., Commonwealth v. O'Searo*, 466 Pa. 224, 234–38, 352 A.2d 30, 35–38 (1976) (specific intent to kill may be inferred by the use of deadly weapon directed at vital parts of body). The Commonwealth is not required to negate every *conceivable* inference within the endless realm of human speculation that is consistent with innocence. *See, e.g., Commonwealth v. Williams*, 476 Pa. 557, 383 A.2d 503, 507 (1978) *and Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468, 479 (1977). The circumstantial evidence presented by the Commonwealth overwhelmingly, and beyond a reasonable doubt, supports the jury's finding that appellant shot and killed Mr. DeVetsco in order to prevent him from testifying in the felony proceedings in Snyder County.

Appellant also makes the frivolous argument that section 9711(d)(5) should be limited to the killing of an "*eye* witness" only, as opposed to a witness who was not present at the scene of the collateral "murder or other felony". Such an interpretation defies logic, common sense, the plain and unambiguous meaning of the statute, and the obvious intention of the drafters who quite clearly were concerned with the type of frontal assault upon the criminal justice system of this Commonwealth as is presented by this case. The damage to that system is equally severe whether the executed witness be the relatively rare (in such cases) eye-

witness or otherwise. Because the "General Assembly does not intend a result that is absurd, impossible of execution or unreasonable," the Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1922(1), we reject appellant's artificial dichotomy.

For the same reasons, we also reject appellant's closely related argument that the phrase "committed by the defendant" indicates a desire on the part of the legislature to impose upon the Commonwealth the additional burden of proving that the collateral "murder or other felony" must have been *actually* committed by the defendant. Such a burden would be unreasonable and frequently impossible of execution, because, by eliminating critical prosecution witnesses, a criminal defendant could make certain that the Commonwealth could not meet that burden. The criminal justice system receives a shocking jolt when a defendant flaunts the law enforcement authority of the Commonwealth by murdering a prosecution witness. The tremors felt throughout that system are extreme and are not diminished in cases where, *by that very act of murder,* the Commonwealth may be prevented from proving that the defendant actually committed the collateral crimes with which he was charged.

Moreover, the burden of proving appellant actually committed the underlying felonies would be particularly onerous in this case, where defense counsel admitted to the court below that Mr. Zettlemoyer had *in fact been convicted* of most of the felonies charged, and acquiesced in the court's analysis that section 9711(d)(5) was concerned with the fact that criminal proceedings were *pending* and *not* with convictions. The Commonwealth could easily have produced proof of the admitted convictions, but defense counsel's acquiescence to the court's proper interpretation of subsection (d)(5) rendered that proof unnecessary.[16]

16. At the sentencing proceeding, defense counsel objected, at sidebar, to the reading of the Snyder County indictments, "especially in light of the fact that [appellant had] not been convicted on all those charges that the district attorney has related but, first of all, I would

46

■ From the foregoing, we hold that the Commonwealth has sustained its burden of proving, beyond a reasonable doubt, the existence of the aggravating circumstance of "killing a prosecution witness to a murder or other felony committed by the defendant . . . for the purpose of preventing his testimony against the defendant in any . . . criminal proceeding involving such offenses." [17]

■ Appellant next alleges the court's charge to the jury regarding the weighing of aggravating circumstances against mitigating circumstances was erroneous and prejudicial. Again, the guiding principle on reviewing an allegedly erroneous jury instruction is that the charge is to be read in its entirety. *Commonwealth v. Woodward, supra.* The relevant portions of the court's charge, with the asserted erroneous portions underscored, are as follows:

You are to decide whether there are certain aggravating circumstances or mitigating circumstances and depending upon how you find those circumstances, as I will explain to you, your decision follows. It must follow. If you find a certain way, a certain penalty must follow. That is the law. If, for example, as I will explain in a little more detail, you find unanimously beyond a reasonable doubt,

object to the naming the felony charges at all. . . ." N.T. April 24, 1981 at 4–5. The court replied that "[i]t is not the conviction. It is what was pending at the time." Counsel agreed: "Yes. I am just objecting to actually naming [the charges]." N.T. at 5. Later, counsel objected to the sufficiency of the Commonwealth's proof of an aggravating circumstance specifying *only* that the victim must have been an "eyewitness" and that the Commonwealth failed to introduce a subpoena of Mr. DeVetsco. N.T. at 10–11. (The latter argument, also frivolous, has been abandoned by appellant). Further, when requesting a charge on the mitigating circumstance of no significant prior criminal convictions, § 9711(e)(1), counsel informed the court that appellant had "been convicted but not sentenced in the Snyder County proceedings." N.T. at 12.

17. Appellant also argues that the verdict of death was against the weight of the evidence. Essentially, this argument is that, since the Commonwealth offered evidence of only one aggravating circumstance and since the defense offered evidence relating to five mitigating circumstances (§ 9711(e)(1–4, 8)), the "weight" of the evidence did not support the jury's finding. This argument is preposterous as it would reduce review of the sentencing process to a "mere numbers game". Opinion of lower court, en banc, slip opinion at 29.

that there is an aggravating circumstance and no mitigating circumstances or that the aggravating circumstance outweighs the mitigating circumstances, you must return a verdict of death. So the burden is not really yours. That is the law that you took an oath to uphold. If you do not, on the other hand, if you find that the mitigating circumstances outweigh the aggravating circumstances, or that there is no aggravating circumstances, then you must return a verdict of life imprisonment.

· · · · ·

The verdict, of course, must be unanimous. Again, if you find unanimously, beyond a reasonable doubt, the aggravating circumstance that I have mentioned, the only one that's applicable, that the victim was a prosecution witness to a felony and it was committed and he was murdered so that he would not testify, that is an aggravating circumstance. If you find that aggravating circumstance and find no mitigating circumstances or if you find that the aggravating circumstance which I mentioned to you outweighs any mitigating circumstance you find, your verdict must be the death penalty. If, on the other hand, you find that the Commonwealth has not proven an aggravating circumstance beyond a reasonable doubt or if they have, that the mitigating circumstances outweigh the aggravating circumstances, then you must bring in a verdict of life imprisonment. N.T. at 33, 36.

■ At this point, defense counsel objected that the charge did not comport with the instruction mandated by the Sentencing Code. Subsection (c) sets forth the following:

(1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:

(i) the aggravating circumstances specified in subsection (d) as to which there is some evidence.

(ii) the mitigating circumstances specified in subsection (e) as to which there is some evidence.

(iii) aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt; mitigating circumstances must be proved by the defendant by a preponderance of the evidence.

(iv) the verdict must be a sentence of death <u>if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances</u>. The verdict must be a sentence of life imprisonment in all other cases.

(v) the court may, in its discretion, discharge the jury if it is of the opinion that further deliberation will not result in a unanimous agreement as to the sentence, in which case the court shall sentence the defendant to life imprisonment.

(2) The court shall instruct the jury on any other matter that may be just and proper under the circumstances.

Comparing the underscored portion of the jury charge with the mandated instructions, it does seem that the charge was technically incorrect in part.[18] However, whatever error may have occurred was completely cured by further instructions. First, the court gave these instructions regarding the verdict slip:

The verdict slip, I have death or life imprisonment; you check whatever it is. If you sentence him to death, then you have to give us the reason. There's two possibilities; you check which one. One aggravating circumstance and no mitigating; then you must list the aggravating circumstance, the killing of a witness to a felony, or you may

---

**18.** "Technically" because the charge, fairly read in its entirety, was correct in charging that where aggravating outweighs mitigating, a death verdict must be rendered, and also was correct in charging that, where mitigating outweighs aggravating, a life sentence must be returned. The charge, then, reveals a slight lacuna which would manifest itself *only* in the unlikely event that the jury considered the evidence of aggravating circumstances to *exactly equal* the mitigating circumstances, for that situation was not covered by the above quoted portions of the charge. As explained further in text, *infra,* the lacuna was filled by the subsequent instructions of the court.

check, aggravating circumstance outweighs the mitigating circumstance. Again, you indicate what the aggravating circumstance is and in this case, there is only one aggravating circumstance in issue. N.T. at 37.

Second, this verdict slip which accompanied the jury into the deliberation room, clearly and in writing instructed the jury that the death penalty was required if there was "at least one aggravating circumstance and no mitigating circumstance," or, as was checked by the jury foreman, if "the aggravating circumstance outweighs the mitigating circumstances".

■ Finally, in response to counsel's objections, the court gave the following additional instructions:

I will try to summarize it, ladies and gentlemen. I don't want to get anybody mixed up on a matter of semantics. Under the law, as I said, you are obligated by your oath of office to fix the penalty at death if you unanimously agree and find beyond a reasonable doubt that there is an aggravating circumstances and either no mitigating circumstance or that the aggravating circumstance outweighs any mitigating circumstances. Now, there has been evidence from which you could find mitigating circumstances. In fact, the one mitigating circumstance is agreed to, that he has no significant history of prior criminal convictions, but what you have to decide is whether the aggravating circumstance, if you find such, outweighs any mitigating and if it does, then your penalty must be death. N.T. at 39.

When read in its entirety, the court's instructions on the weighing process was correct, any possible error having been cured by subsequent instruction. *Commonwealth v. Hughes,* 477 Pa. 180, 383 A.2d 882 (1978); *Commonwealth v. Rodgers,* 459 Pa. 129, 327 A.2d 118 (1974). Nor was it erroneous, as appellant further contends, for the court to refuse to specifically inform the jury that mitigating circumstances need not outweigh aggravating in order to find in favor of life imprisonment. The curative instructions were sufficient to dispel any mistaken impressions the jury may have had, and

the court was not required to use the language requested by counsel. *See Commonwealth v. Lesher,* 473 Pa. 141, 373 A.2d 1088 (1977) (court free to use its own form of expression; only issue is whether area is adequately, accurately and clearly presented to jury).

It is next argued that the court erred in permitting the Commonwealth to read to the jury the indictments in the Snyder County criminal proceedings.[19] Under the circumstances of this case, we find no error in allowing the indictments to have been read, nor do we find the sentence of death to have been the product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S.A. § 9711(h)(3)(i).

It is true that, as a general rule, it is impermissible, in a criminal trial, to introduce evidence of a defendant's prior convictions simply to demonstrate his bad character or propensity to commit crimes. *Commonwealth v. Spruill,* 480 Pa. 601, 606, 391 A.2d 1048 (1978). However, this rule is subject to numerous exceptions where the prior convictions are relevant to some valid evidentiary purpose. *Commonwealth v. Lasch,* 464 Pa. 573, 347 A.2d 690 (1973).

In the instant case, it was incumbent upon the Commonwealth to demonstrate that appellant's victim was a witness to a "murder or other *felony* ...". In order to prove that

19. This issue was not raised in post-verdict motions and is, accordingly, waived. *Commonwealth v. Gravely,* 486 Pa. 194, 404 A.2d 1296 (1978). However, for the reasons stated in *Commonwealth v. McKenna,* 476 Pa. 428, 437–41, 383 A.2d 174 (1978), and because this Court has an independent, statutory obligation to determine whether a sentence of death was the product of passion, prejudice or some other arbitrary factor, whether the sentence is excessive or disproportionate to that imposed in similar cases, and to review the record for sufficiency of the evidence to support aggravating circumstances, we will not adhere strictly to our normal rules of waiver. The primary reason for this limited relaxation of waiver rules is that, due to the final and irrevocable nature of the death penalty, the appellant will have no opportunity for post-conviction relief wherein he could raise, say, an assertion of ineffectiveness of counsel for failure to preserve an issue or some other reason that might qualify as an extraordinary circumstance for failure to raise an issue. 19 P.S. § 1180–4(2). Accordingly, significant issues perceived *sua sponte* by this Court, or raised by the parties, will be addressed and, if possible from the record, resolved.

the Snyder County criminal proceeding was a *felony* prosecution, the Commonwealth chose to read the indictments in that case. Defense counsel objected, stating that only the *fact* that the proceedings were of a felony nature, and not the *facts* of the indictments, should be admitted. The objection was overruled and the prosecutor read the indictments in a neutral manner.[20]

**20.** The indictments, in their entirety, were presented as follows (N.T. 6–9):

MR. LEWIS: Your Honor, the Commonwealth's evidence has been agreed to by stipulation and is as follows: that the grand jury of Snyder County, Pennsylvania, in reference to No. 95 of 1980, case entitled Commonwealth of Pennsylvania versus Keith Zettlemoyer, R.D. 2, Selinsgrove, Pa., that on May 26, 1980, the Grand Jury of Snyder County indicted Keith Zettlemoyer on the following counts: "Count No. 1, on or about May 26, 1980, the defendant did unlawfully, knowingly and with the intent of promoting or facilitating the commission of a crime, agree with another person or persons, namely Kenneth Eugene Kipple, that they or one or more of them would engage in conduct which constitutes a crime or crimes or an attempt or solicitation to commit such crime or crimes, namely, theft, burglary, theft, robbery, kidnapping, unlawful restraint, violation of the Uniform Firearms Act and unauthorized use of a motor vehicle, and receiving stolen property, or agreed to aid such other person or persons in the commission of such crime or crimes, or of an attempt or solicitation to commit such crime or crimes, and that a substantial step was taken with intent of fulfilling the criminal objective said conspiracy, a felony of the second degree, in violation of Section 903 of the Pennsylvania Crimes Code;

Count No. 2, that the defendant did on or about May 26, 1980, unlawfully and feloniously enter a building in Monroe Township, Snyder County, Pennsylvania, namely the Susquehanna Valley Mall with intent to commit a crime therein; that is to say with intent to commit theft by unlawfully taking movable property of the said Susquehanna Valley Mall and/or burglary and theft of various stores within the Susquehanna Valley Mall. Said premises were not open to the public at the time, nor was the defendant licensed or privileged to enter, in violation of Section 3502(a) of the Pennsylvania Crimes Code, a felony of the first degree of the Crimes Code, 18 Purdon's Statutes, 3502(a);

Count No. 3, that the defendant did, on or about May 26, 1980, unlawfully and feloniously enter a separately secured portion of a building in Monroe Township, Snyder County, Pennsylvania, namely, the Radio Shack, a separately secured structure within the Susquehanna Valley Mall, with intent to commit a crime therein, that is to say, with intent to commit theft by unlawfully taking movable property of the said Radio Shack. Said premises were not open to the public at the time, nor was defendant licensed or privileged to enter,

Immediately after the indictments were read, the court informed the jury:

Ladies and gentlemen, the sole purpose of reading that, we are not concerned as such with those charges but under the law, one of the aggravating circumstances under which the death penalty may be brought, and I will explain this more fully, one of the aggravating circumstances is that the victim was a prosecution witness to a felony committed by the defendant was killed for the

in violation of Section 3502(a) of the Crimes Code, a felony of the first degree, of the Crimes Code;

Count No. 4, this is continued and pages two of the Grand Jury's indictment of May 26, Count No. 4, that the defendant on or about May 26, 1980, did unlawfully take or exercise unlawful control over movable property of the Radio Shack and Charles D. Fox with intent to deprive them thereof; namely, cash, a Realistic 3 Channel—

THE COURT: I don't think we need to detail it.

MR. LEWIS: All right. "—having a value, all the property mentioned, having a value of more than two thousand dollars, which constitutes a felony of the third degree, in violation of Section 3921(a) of the Crimes Code;

Count No. 5, that the defendant did, on or about May 26, 1980, unlawfully and feloniously, in the course of committing a theft, threaten another with or intentionally put another, namely Charles D. Fox, in fear of serious bodily injury, a felony of the first degree, in violation of Section 3701(a)(ii) of the Crimes Code;

Count No. 6, that the defendant did, on or about May 26, 1980, unlawfully and feloniously remove another person a substantial distance or unlawfully confine another, namely Charles D. Fox, for a substantial period in a period of isolation, with intent to facilitate commission of a felony of flight thereafter, a felony of the first degree, in violation of Section 2901(a)(2) of the Crimes Code;

Count No. 7, that the defendant did, on May 26, 1980, unlawfully and knowingly, restrain another, namely Charles D. Fox, in circumstances exposing him to risk of serious bodily injury, a misdemeanor of the first degree in violation of Section 2902 of the Crimes Code—

MR. TARMAN: Your Honor, I certainly object to that.

THE COURT: Yes. We won't read misdemeanors. Any other felonies?

MR. LEWIS: Count No. 10, that the defendant did, on or about May 26, 1980, unlawfully and intentionally receive and retain property belonging to Radio Shack and Charles D. Fox, namely, cash and communication equipment, knowing that said property had been stolen or believing that it had been stolen and with no intent to restore same to owner, said property having a value in excess of two thousand dollars, a felony of the third degree, in violation of Section 3925(a) of the Crimes Code.

purpose of preventing his testimony against the defendant, and that was the purpose of admitting this evidence, and the sole purpose of it. N.T. at 9–10.

In light of the essential evidentiary value of the felony charges, the neutral and unimpassioned reading of the indictments, the immediate clarifying instruction by the court, and the fact that, by the evidence presented at the first stage of these proceedings, the jury was already fully aware that appellant was on trial for serious criminal charges in Snyder County, we find no error in permitting the Commonwealth to proceed in this manner.[21]

Appellant also contends that the court erred in refusing his motion for a mistrial following allegedly improper and prejudicial remarks by the prosecutor pertaining to the deterrent effect of the death penalty. As stated in *Commonwealth v. Brown,* 489 Pa. 285, 297–98, 414 A.2d 70 (1980):

> The primary guideline in assessing a claim of error of this nature is to determine whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. *Commonwealth v. McNeal,* 456 Pa. 394, 319 A.2d 669 (1974); *Commonwealth v. Van Cliff,* 483 Pa. 576, 397 A.2d 1173 (1979). In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding, Code of Professional Responsibility, Canon 7, E.C. 7–19—7–39, and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury. *Commonwealth v. Cronin,* 464 Pa. 138, 346 A.2d 59 (1975). Nevertheless, we

This is signed by the Grand Jury Foreman on the date I previously mentioned. N.T. at 6–9.

21. It is certainly conceivable that the reading of a "loaded" indictment, *i.e.,* one drafted with full disclosure of gory and/or inflammatory factual details, could so inflame the jury that the possibility of prejudice would outweigh the evidentiary value of reading the indictments. We are not confronted with that problem in the instant case.

do require that the contentions advanced must be confined to the evidence and the legitimate inferences to be drawn therefrom. *Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972). Deliberate attempts to destroy the objectivity and impartiality of the finder of fact so as to cause the verdict to be a product of the emotion rather than reflective judgment will not be tolerated. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). The verdict must flow from the respective strengths and weaknesses of the evidence presented and not represent a response to inflammatory pleas for either leniency or vengeance. *Commonwealth v. Starks,* 479 Pa. 51, 387 A.2d 829 (1978).

In his brief closing argument at the sentencing proceeding, the district attorney began with an appeal to the jury to judge the case solely and exclusively on the facts and the law, and to avoid any temptation to enter a verdict based on emotions. The prosecutor, of course, informed the jury that the Commonwealth was seeking the death penalty because the legislature had determined the killing of a witness in a criminal prosecution to be an attack on our system of criminal justice,. warranting the severest sanction of that system which he sought to destroy. The following exchange then took place:

DISTRICT ATTORNEY: You have to consider, number one, the appropriate punishment and number two, you have to consider what, if any, deterrent effect your decision should have—

DEFENSE COUNSEL: Your Honor, I would object to the deterrent effect. I think the District Attorney should be only allowed to argue the law, that the law is specific that only those aggravating circumstances in the law can be considered. The deterrent effect of the death penalty has no place in their deliberations.

THE COURT: Overruled. Proceed.

DISTRICT ATTORNEY: You, as the jury, have a right to consider upholding the system. You, as the jury, have a right to consider what effect your decision as to the penalty we impose on Mr. Zettlemoyer, what place the

deterrent effect should play in that decision and I submit to you it is a very important one and it is a very crucial one.

The Commonwealth simply asks for a just decision in this case. We ask for a just decision based on everything you have heard during the trial. Incorporate all this testimony in your deliberations. You heard it, you were right here in the room, you heard everything. We submit to you that the death penalty in this case is justified because of the nature of the crime, because of its attack upon our system of justice and we ask you to consider all those factors.

Thank you very much for your attention.

■ Appellant claims that the district attorney's references to the "deterrent effect" was improper because it has never been conclusively proven that the death penalty serves as a meaningful deterrent to murder and that it was improper, therefore, to refer to an "unproven" fact. Appellant is correct that, despite the Herculean efforts of lawmakers, scholars, and sociologists to prove whether the death penalty has, in fact, any significant deterrent effect, no conclusive proof has been forthcoming. *See, e.g., Gregg v. Georgia, supra* 428 U.S. at 233–34, 96 S.Ct. at 2973–74 (Marshall, J., dissenting), citing *Furman v. Georgia,* 408 U.S. 238, 345–354, 92 S.Ct. 2726, 2780–2784, 33 L.Ed.2d 346 (Marshall, J., concurring). Appellant is not correct, however, in arguing that this remark by the district attorney was improper or prejudicial.

■ As noted, the Commonwealth, just as the defense counsel, must have reasonable latitude in arguing his position to the jury. *Commonwealth v. Smith,* 490 Pa. 380, 416 A.2d 986 (1980). The Sentencing Code itself provides that after "the presentation of evidence, the court shall permit counsel to present argument for or against the sentence of death." 42 Pa.C.S.A. § 9711(a)(3). The court en banc held that the district attorney's summation, which was "calm, not inflammatory and quite professional", did not exceed the reasonable latitude granted counsel to argue for the death

penalty, finding that, although there was no evidence presented on the issue of deterrent effect, it was a matter of "common public knowledge based on ordinary human experience".

This same conclusion was reached by Mr. Justice White, announcing the result of the Court in *Gregg v. Georgia, supra,* wherein he stated that, despite the lack of statistical data supporting or refuting the "deterrence" of the death penalty, there are many would-be murderers for whom "the death penalty undoubtedly is a significant deterrent. There are carefully contemplated murders, such as murder for hire, where the possible penalty of death may well enter into the cold calculus that precedes the decision to act. Other types of calculated murders ... include ... the execution-style killing of witnesses to a crime." 428 U.S. at 186–87, and 187 n. 33, 96 S.Ct. at 2931–2932, and 2931 n. 33. The prosecutor's remarks about deterrence followed immediately after the prosecutor's discussion of this type of calculated execution of a witness and asked the jury, only briefly, to consider the deterrent effect of the death penalty in such cases. We do not believe that the impact of this statement, which is a "matter of common public knowledge based on ordinary human experience," [22] would have biased or prejudiced the jury or hindered an objective weighing of the evidence, especially considering the district attorney's explicit directions to the jury to return a verdict of death "solely and exclusively as the law indicates it may be [imposed], based on the circumstances of this case, that it involved a premeditated, intentional killing of a witness to a serious crime, a felony." N.T. at 31.[23] We have examined the record of these proceedings and find that neither this disputed remark

22. The ABA Standards for Criminal Justice, § 3–59, approve the prosecutor's reference to such off-the-record "facts".

23. Additionally, it should be noted that defense counsel was given extremely wide latitude to refer to items dehors the record, including the diminished capacity of President Reagan's assailant and the "sickness" of the "guy down in Atlanta". The ABA Standards for Criminal Justice, § 3–5.8, make it clear that the latitude granted the prosecutor may be somewhat increased where defense counsel has injected extraneous issues into the closing argument.

of the prosecutor nor any other factor indicates that the sentence of death may have been the product of passion, prejudice or in any way arbitrary. 42 Pa.C.S.A. § 9711(h)(3)(i).

## IIB. VALIDITY OF SENTENCE—CONSTITUTIONAL ARGUMENTS

It should be apparent that the latest version of the Sentencing Code has responded to the announcements of this Court, *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977) and of the United States Supreme Court, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The constitutional deficiencies identified in those cases was the failure to permit the jury to consider a sufficiently broad spectrum of circumstances relating to the character of the offender, as well as to the circumstances of the offense. The legislature has now cured this deficiency in providing that the jury can consider a wide range of seven specific mitigating circumstances (set forth at note 13, *supra*), as well as "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S.A. § 9711(e)(8).

Nevertheless, appellant and amici curiae [24] assert that the Sentencing Code falls short of the constitutional mark in several aspects. Preliminarily, we must reiterate that perfection is not required, *nor is it possible*—there is no perfect procedure for deciding in which cases governmental authority should be used to impose a sentence of death. *Lockett v. Ohio, supra* at 605, 98 S.Ct. at 2965. The requirement that the jury must be allowed to consider "whatever mitigating evidence relevant to his character and evidence the defendant can present," *Commonwealth v. Moody, supra* 476 Pa. at 237, 382 A.2d at 449, mandates that a certain amount of

**24.** Participating in briefing and oral arguments are, in favor of constitutionality, the Attorney General of Pennsylvania, Leroy S. Zimmerman, and the Pennsylvania District Attorneys Association; opposed to a finding of constitutionality are the NAACP Legal Defense and Educational Fund, Inc., and the ACLU of Greater Philadelphia, with the ACLU Foundation.

flexibility be built into any capital punishment sentencing structure, and moreover, virtually assures some "imperfection" in sentencing. Yet this *requisite* degree of flexibility is compatible with the federal and state constitutions if procedures exist which serve to focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the offender, thus channeling the jury's discretion in order to ensure that, with the assistance of appellate scrutiny, the death sentence has not been imposed in an arbitrary and capricious manner. *Gregg v. Georgia, supra* 428 U.S. at 206–07, 96 S.Ct. at 2940–2941 (Stewart, J., Opinion announcing the judgment of the Court); *Lockett v. Ohio, supra* 438 U.S. at 601, 98 S.Ct. at 2963 (it is not required that all sentencing discretion be eliminated, but only that it be directed and limited so that the death penalty will be imposed in a more consistent and rational manner and so that there will exist a meaningful basis for distinguishing the cases in which it is imposed from those in which it is not.)

Furthermore, in assessing the validity of the Sentencing Code we must remain mindful of another extremely important consideration, namely that:

it is the *legislature* which has adopted the death penalty as a possible sentence for murder of the first degree in Pennsylvania. In considering such an emotionally charged, controversial and polarizing issue such as the death penalty, the legislature is peculiarly well-adapted to respond to the consensus of the people of this Commonwealth. Regardless of the personal beliefs of any member of this Court, it is manifestly not our function or prerogative to perform as a super-legislature and disturb the determination of the General Assembly absent a demonstration that the legislative enactment "*clearly, palpably* and *plainly* violates" some specific mandate or prohibition of the constitution. *Snider v. Thornburgh,* 496 Pa. 159 at 166, 436 A.2d 593 at 596 (1981), citing *Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 331 A.2d 198 (1975).

In *Snider v. Thornburgh, supra,* this Court identified "what is perhaps the most fundamental principle of statutory construction: the presumption that the legislature has acted constitutionally. This presumption 'reflects on the part of the judiciary the respect due to the legislature as a co-equal branch of the government.' *School District of Deer Lakes v. Kane,* 463 Pa. 554, 562, 345 A.2d 658, 662 (1971)." 496 Pa. at 159, 436 A.2d at 596.

So too, in *Gregg v. Georgia, supra* 428 U.S. at 174–76, 96 S.Ct. at 2925–26, the United States Supreme Court instructed:

But, while we have an obligation to insure that constitutional bounds are not overreached, we may not act as judges as we might as legislators.

"Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. The essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures." *Dennis v. United States,* 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring in affirmance of judgment).

Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society

legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Furman v. Georgia, supra,* 408 U.S., at 383, 92 S.Ct., at 2800 (Burger, C.J., dissenting).

Accordingly, this Court is constrained from interference with the legislative judgment that the crime of murder of the first degree, coupled with specific aggravating circumstances, is a heinous enough act to warrant imposition of the death penalty under carefully drafted sentencing procedures, unless appellant can meet his heavy burden of demonstrating the unconstitutionality of 18 Pa.C.S.A. § 1311 [transferred to 42 Pa.C.S.A. § 9711: *see* note 11, *supra* ] in some particular.

*Commonwealth v. Story, supra* 497 Pa. 273 at 297–98, 440 A.2d 488 at 500–01 (Larsen, J., dissenting, joined by Flaherty and Kauffman, JJ.) With these principles to guide us, we proceed to the specific allegations of unconstitutionality.

■ Appellant and amici argue vigorously that the statutory provisions for appellate review are inadequate to ensure that the jury's discretion has been channelled so as to prevent the arbitrary and capricious imposition of the death penalty. We cannot accept this proposition.

■ It is certain that the United States Supreme Court considers meaningful appellate review by a court having statewide jurisdiction to be at least a very important factor (perhaps a *sine qua non*) in a constitutionally permissible legislative scheme for imposition of the death penalty, because such review is, in effect, a "last line of defense" to guard against arbitrary sentencing by a jury.[25] However, the United States Supreme Court has also made it clear that no *particular* mechanism of appellate review is required, and has never struck down a state's capital punishment scheme

**25.** *See, e.g., Gregg v. Georgia, supra* 428 U.S. at 198, 204–06, 96 S.Ct. at 2936, 2939–2940 (opinion by Stewart, J. announcing the judgment of the Court) and at 211 (concurring opinion by White, J.), *Proffitt v. Florida, supra* 428 U.S. at 251, 253, 258–59, 96 S.Ct. at 2966, 2967, 2969–2970 (opinion by Stewart, J., announcing the judgment of the Court), *Jurek v. Texas, supra* 428 U.S. at 276, 96 S.Ct. at 2958 (opinion by Stewart, J., announcing the judgment of the Court).

on the basis that the review by the state appellate courts was inadequate, choosing to assume, in the absence of evidence to the contrary, that the state courts would properly fulfill their obligations to ensure against arbitrary and capricious imposition of the death penalty.

It is true, as appellant and amici point out, that the elaborate administrative procedures provided by statute in Georgia to facilitate and expedite appellate review by the Supreme Court of Georgia [26] were well received by the United States Supreme Court in *Gregg v. Georgia, supra.* The suggestion that such mechanisms are constitutionally required, however, flies in the face of the latter Court's explicit pronouncement in *Proffitt v. Florida, supra.*

In *Proffitt,* the petitioner had asserted that the rather general provision for appellate review under the Florida statute was subjective and unpredictable, and therefore unconstitutional. The statute, Fla.Stat.Ann. § 921.141 Crim. Proc. & Corrections, provides only that the judgment of conviction and sentence of death shall be subject to automatic and expedited review by the Supreme Court of Florida. While the statute did not so provide, the Florida high court nevertheless undertook the task of reviewing each death sentence to ensure that similar results were reached in similar cases. *State v. Dixon,* 283 So.2d 1, 10 (Fla.Sup.Ct. 1973). The United States Supreme Court rejected petitioner's argument, holding:

> While it may be true that [the Florida Supreme Court] has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary. In fact, it is apparent that the Florida court has undertaken responsibly to perform its function of death sentence

**26.** These procedures include the requirements that the trial judge fill out a 6½ page questionnaire concerning the trial and sentencing proceedings, that the Georgia Supreme Court will compare similar cases for excessiveness or disproportionality and list the similar cases in its opinion, and the creation of a special administrator attached to that Court to compile and preserve data on all capital punishment cases.

62

review with a maximum of rationality and consistency. For example, it has several times compared the circumstances of a case under review with those of previous cases in which it has assesed the imposition of death sentences. *See, e.g., Alford v. State,* 307 So.2d [433], at 445; *Alvord v. State,* 322 So.2d, [533] at 540–541. By following this procedure the Florida court has in effect adopted the type of proportionality review mandated by the Georgia statute.

*Proffitt v. Florida, supra* 428 U.S. at 258–59, 96 S.Ct. at 2969–2970. And, in *Jurek v. Texas, supra* 428 U.S. at 276, 96 S.Ct. at 2958 the Court stated: "By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational and consistent imposition of death sentences under law." (Opinion by Stewart, J., announcing the judgment of the Court). Texas merely provided, as did Florida, that the Texas Court of Criminal Appeals shall automatically and expeditiously review the conviction and sentence of death, Tex.Code Crim.Proc. Art. 37.071(f), and provided no substantive guidelines nor procedural mechanisms for appellate review. The United States Supreme Court presumed that the Texas court would adequately perform its statutory and constitutional obligations. *Id.* at 279, 96 S.Ct. at 2959 (White, J., concurring).

 From the foregoing, it is clear that so long as an appellate court of statewide jurisdiction will conduct a meaningful review of a sentence of death to guard against its arbitrary and capricious imposition, the United States Supreme Court will not interfere with the state's choice of appellate and administrative mechanisms. (On March 21, 1983, certiorari was granted by the United States Supreme Court in the case of *Pulley v. Harris,* 82–1095, 32 Cr.L. 2050 (9th Cir.). This case presents the opportunity for that Court to delineate the exact parameters of the constitutional requirements for appellate review of death penalty cases, specifically whether any particular form of "proportionality review" by a court of statewide jurisdiction is required and,

if so, the focus, scope and procedural structure of such review. 32 Cr.L. 4229.) This Court does not treat lightly its statutory and constitutional duties and will conduct an independent evaluation of all cases decided since the effective date of the sentencing procedures under consideration (September 13, 1978). This independent review mandated by 42 Pa.C.S.A. § 9711(h)(3)(iii) will utilize all available judicial resources and will encompass all similar cases, taking into consideration both the circumstances of the crime and the character and record of the defendant in order to determine whether the sentence of death is excessive or disproportionate to the circumstances.

 Our review indicates that, as would be expected with an aggravating circumstance as specific as § 9711(d)(5), the first degree murder cases involving the killing of a prosecution witness to a murder or other felony are infrequent. The only case that our research indicates has proceeded to a jury verdict under § 9711(d)(5) of the Act of September 13, 1978, has also resulted in a sentence of death.[26a] We find, therefore, that in Pennsylvania, the sentence of death for murder of the first degree involving the aggravating circumstance of killing a prosecution witness to a murder or other felony is not "excessive or disproportionate to the sentence imposed in similar cases."

 Appellant makes a related argument that, because the jury is not required to indicate, in writing or otherwise, the mitigating circumstances that it finds to exist, this Court will not be able to properly perform its appellate duties. Such argument assumes that this Court is not able to review the record of the trial and sentencing proceedings, which is assuredly not the case. We have reviewed in this

**26a.** The case is *Commonwealth v. Mack Truesdale,* Philadelphia County Court of Common Pleas, Criminal Division 7607—135–136, docketed on appeal with this Court, 81-3-483. In this case, the defendant was convicted of murder of the first degree for the killing of a person who had witnessed the murder of another victim during a drug transaction. The jury found three aggravating circumstances, including § 9711(d)(5), killing of a prosecution witness to a murder, (the others were § 9711(d)(7, 10)), no mitigating circumstances, and returned a sentence of death.

case, as we will in the future, the entire record and will evaluate "similar cases" on the basis of the evidence presented as to mitigating circumstances. Thus, the lower court did not abuse its discretion in refusing defense counsel's request to poll the jury as to which mitigating circumstances it found.

It is next argued that section 9711 of the Sentencing Code improperly allocates the burden of proof by placing the risk of non-persuasion on the defendant, who is required to convince the jury that mitigating circumstances exist by a preponderance of the evidence. Subsection (c)(iii) provides that aggravating circumstances must be proved by the Commonwealth beyond a reasonable doubt and that mitigating circumstances be proved by the defendant by a preponderance. Appellant and amici suggest that this allocation violates the due process protections of the Fifth and Fourteenth Amendments to the United States Constitution which protect "the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). This suggestion is unfounded, as is made evident by *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), a case which is conspicuous by its absence from the briefs of appellant or amici.

In *Patterson,* the United States Supreme Court held it proper to place, even at the guilt stage, the burden of proving an affirmative defense upon a defendant (specifically in that case, the defense of "extreme emotional disturbance"). That Court held, at 205–06, 97 S.Ct. at 2324–2325:

We cannot conclude that Patterson's conviction under the New York law deprived him of due process of law. The crime of murder is defined by the statute, which represents a recent revision of the state criminal code, as causing the death of another person with intent to do so. The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further

facts are either presumed or inferred in order to constitute the crime. The statute does provide an affirmative defense—that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation—which, if proved by a preponderance of the evidence, would reduce the crime to manslaughter, an offense defined in a separate section of the statute. It is plain enough that if the intentional killing is shown, the State intends to deal with the defendant as a murderer unless he demonstrates the mitigating circumstances.

Here, the jury was instructed in accordance with the statute, and the guilty verdict confirms that the State successfully carried its burden of proving the facts of the crime beyond a reasonable doubt. Nothing in the evidence, including any evidence that might have been offered with respect to Patterson's mental state at the time of the crime, raised a reasonable doubt about his guilt as a murderer; and clearly the evidence failed to convince the jury that Patterson's affirmative defense had been made out. It seems to us that the State satisfied the mandate of *Winship* that it prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [Patterson was] charged." 397 U.S., at 364, 90 S.Ct., at 1073. Other decisions of that Court, and of this, have expressed approval of legislative schemes placing the burden of proving mitigating circumstances on a defendant. *See Proffitt v. Florida, supra and Commonwealth v. Moody,* 476 Pa. at 237, 382 A.2d at 449 ("[I]n our view, in order to protect a defendant from cruel and unusual punishment in a capital case, it is now necessary both that the aggravating circumstances that will justify the imposition of the death penalty be clearly defined . . . and that the sentencing authority be allowed to consider whatever mitigating evidence relevant to his character and record *the defendant can present.*")

Under 42 Pa.C.S.A. § 9711(c), the Commonwealth, by proving guilt beyond a reasonable doubt of murder of the first degree and of the existence of one or more aggravating

circumstances, has demonstrated all that is constitutionally required of it. In meeting this burden, the Commonwealth must prove every element necessary to establish murder of the first degree and every element necessary to establish one or more aggravating circumstance which the legislature has determined is of a sufficiently heinous nature as to require imposition of the death penalty. The accused is then given the opportunity to prove, by a preponderance of the evidence, that there are mitigating circumstances that might convince a jury that the sentence should nevertheless be set at life imprisonment. Such an allocation is not offensive to due process.

■ It is further contended that the Sentencing Code is unconstitutional because it supplies no fixed burden of proof as to the weighing of aggravating circumstances against mitigating circumstances, and that the standards are, therefore, impermissibly vague. Appellant and amici would have us invalidate this procedure because the Sentencing Code fails to instruct the jury that the aggravating circumstances must outweigh the mitigating circumstances "beyond a reasonable doubt" or, alternatively, by some lesser articulated standard which would inform the jury as to what extent the aggravating circumstances must outweigh the mitigating. For the reasons stated in the preceding section regarding allocations of burdens of proof, we are not persuaded by this contention.

The jury is simply asked to determine whether aggravating circumstances *outweigh* mitigating. 42 Pa.C.S.A. § 9711(c)(iv). Such a standard is not vague. Appellant would prefer a stricter weighing standard but, as we have seen, the Commonwealth has the burden of proving beyond a reasonable doubt *every* element of the offense and of the aggravating circumstances required to sustain a death sentence, and this Court is not at liberty to tamper with the constitutionally permissible legislative judgment regarding that weighing process. The United States Supreme Court rejected a similar contention in *Proffitt v. Florida, supra* 428 U.S. at 257–58, 96 S.Ct. at 2968–2969:

In a similar vein the petitioner argues that it is not possible to make a rational determination whether there are "sufficient" aggravating circumstances that are not outweighed by the mitigating circumstances, since the state law assigns no specific weight to any of the various circumstances to be considered. See § 921.141 (Supp. 1976–1977).

While these questions and decisions may be hard, they require no more line drawing than is commonly required of a factfinder in a lawsuit. For example, juries have traditionally evaluated the validity of defenses such as insanity or reduced capacity, both of which involve the same considerations as some of the above-mentioned mitigating circumstances. While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.

The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed.

██ Amici, NAACP, argues that another facet of Pennsylvania criminal jurisprudence, namely the practice of instructing the jury in a homicide trial on the elements of the offense of voluntary manslaughter, upon request, whether or not evidence exists to support such a charge, *see e.g., Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974), *cert. denied* 419 U.S. 100, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974) *and Commonwealth v. Harris,* 472 Pa. 406, 372 A.2d 757 (1977), invites the jury to disregard their oaths to apply the

law to the evidence and, therefore, encourages arbitrary and capricious sentencing in homicide cases in violation of the Eighth and Fourteenth Amendments as interpreted in *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), one of the 1976 quintet of death penalty cases.[27] (In the instant case, no request for voluntary manslaughter instructions were made, as such instructions would have been incompatible with the defense offered, since it admitted liability for either murder of the first or murder of the third degree). The evil addressed in *Furman* and in *Bradley* was that the death penalty practices and procedures then in effect failed to adequately channel a jury's discretion and, thus, allowed for arbitrary and capricious sentences of death which failed to reveal why the death penalty was imposed in some (few) cases but not in other, similar, instances.

Amici relies on *Roberts* to support its proposition that the Pennsylvania practice on voluntary manslaughter instructions continues to invite jury arbitrariness in sentencing despite the elaborate provisions of 42 Pa.C.S.A. § 9711. In *Roberts,* the United States Supreme Court considered Louisiana's "unique system of responsive verdicts", *supra* at 332, 96 S.Ct. at 3005, wherein the jury, in every first-degree murder case, is instructed on the crimes of first-degree murder, second-degree murder, and manslaughter, whether or not there is any evidence adduced at trial to support a verdict of voluntary manslaughter, and held:

Louisiana's mandatory death sentence statute also fails to comply with *Furman's* requirement that standardless jury discretion be replaced by procedures that safeguard against the arbitrary and capricious imposition of death sentences. The State claims that it has adopted satisfactory procedures by taking all sentencing authority from juries in capital murder cases. This was accomplished, according to the State, by deleting the jury's pre-*Furman* authority to return a verdict of guilty without capital punishment in any murder case. See La.Rev.Stat.Ann.

27. For the reasons expressed in note 19, *supra,* we will address the merits of this contention despite the failure of appellant to raise and preserve the issue.

§ 14:30 (1974); La.Code Crim.Proc.Ann., Arts. 814, 817 (Supp.1975).

Under the current Louisiana system, however, every jury in a first-degree murder case is instructed on the crimes of second-degree murder and manslaughter and permitted to consider those verdicts *even if there is not a scintilla of evidence to support the lesser verdicts.* See La.Code Crim.Proc.Ann., Arts. 809, 814 (Supp.1975).

And, if a lesser verdict is returned, it is treated as an acquittal of all greater charges. See La.Code Crim.Proc. Ann., Art. 598 (Supp.1975). This responsive verdict procedure not only lacks standards to guide the jury in selecting among first-degree murderers, but *it plainly invites the jurors to disregard their oaths and choose a verdict for a lesser offense whenever they feel the death penalty is inappropriate.* There is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to disregard the trial judge's instructions. The Louisiana procedure neither provides standards to channel jury judgments nor permits review to check the arbitrary exercise of the capital jury's *de facto* sentencing discretion. See *Woodson v. North Carolina,* 428 U.S., [280] at 302–303, 96 S.Ct., [2978] at 2990–2991.

*Id.* 428 U.S. at 334–35, 96 S.Ct. at 3006–3007. It seems that the Court was influenced in its decision by a combination of factors: the mandatory verdict of death for first-degree murder, the unfettered discretion of the jury to return a lesser offense, coupled with the facts that, in Louisiana, "there are no standards provided to guide the jury in the exercise of its power to select those first-degree murderers who will receive death sentences, and there is no meaningful appellate review of the jury's decision." *Id.* at 335–36, 96 S.Ct. at 3007.

Mr. Justice White dissented in *Roberts,* joined by the Chief Justice, Mr. Justice Blackmun and Mr. Justice Rehnquist. The dissenters would have found the Louisiana responsive verdict system valid because the jury was not

instructed that it could *in its discretion* convict of a lesser included offense. Rather, they were simply given the various instructions so that, if they did not believe beyond a reasonable doubt that the defendant was guilty of first degree murder, they were free to consider the lesser verdicts. *Id.* at 347, 96 S.Ct. at 3012.

That the *combination* of factors—mandatory death sentences for first degree murder, charging on lesser included offenses, lack of sentencing standards/guidelines, and lack of meaningful appellate review—produced the unconstitutional result in Louisiana is apparent from the companion cases of *Gregg v. Georgia, supra, Proffitt v. Florida, supra,* and *Jurek v. Texas, supra.* In each of those cases, the petitioners had argued that discretionary aspects of the states' criminal justice system, including prosecutorial discretion in charging, plea bargaining, executive clemency and the practice of charging the jury on lesser included offenses, presented the potential evil of arbitrary and capricious decision-making which was condemned in *Furman* and *Bradley.* As Mr. Justice White stated, such a contention "seems to be in the final analysis an indictment of our entire system of justice", *Gregg v. Georgia, supra* 428 U.S. at 225–26, 96 S.Ct. at 2949–2950 (White, J., concurring, joined by the Chief Justice and Rehnquist, J.), and was unacceptable. *Id.* The opinion of Mr. Justice Stewart stated:

First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

*Id.* 428 U.S. at 199, 96 S.Ct. at 2937. (Opinion of Stewart, J., announcing the judgment of the Court, joined by Powell and Stevens, JJ.)

The sentencing procedures in Pennsylvania more closely approximate the Georgia, Florida and Texas procedures than those of Louisiana. Juries in Pennsylvania are not mandated to impose the death penalty in all cases of murder of the first degree, and are not left without guidelines in the determination of whether to impose death or life imprisonment. Perhaps the most significant difference between this Commonwealth and Louisiana is this state's provisions for meaningful appellate review for excessiveness and disproportionality in similar cases.

In the instant proceeding, our review of similar cases does not encompass those cases where a defendant requested, or might have requested, a charge on voluntary manslaughter. Appellant herein admitted criminal liability for either murder of the first or murder of the third degree. His defense specifically eschewed any possibility of an instruction on any lesser offense. It would be inappropriate, therefore, to include cases in the comparison wherein the jury was instructed on voluntary manslaughter in the absence of evidence to support such verdict. Accordingly, we need not

decide whether, in an appropriate case, the Pennsylvania practice (of charging the jury on voluntary manslaughter, upon request, where there is no evidence to support such a verdict) leads to arbitrary and capricious results, or presents a substantial possibility of arbitrariness.

Recent decisions of this Court have indicated an erosion of the rule expressed in *Commonwealth v. Jones, supra, see, e.g., Commonwealth v. Manning,* 477 Pa. 495, 384 A.2d 1197 (1978) (dissenting opinion by Nix, J., author of opinion in support of affirmance in *Jones*), and a recognition, although belated, that permitting the jury to consider a verdict where no evidence exists to support it invites arbitrariness. *Id., and see Commonwealth v. Milton,* 491 Pa. 614, 421 A.2d 1054 (1980). It is indeed ironic that the *Jones* rule (on voluntary manslaughter instructions) is now alleged to create a possibility of arbitrariness, since the rule was adopted, in large part, because of a perceived potential for arbitrariness in reposing in the trial judge the discretion whether to so charge. *See Commonwealth v. Jones,* 457 Pa. at 578, 319 A.2d 142 (Roberts, J., opinion in support of affirmance: "[b]ecause the choice whether or not to charge [on voluntary manslaughter] is discretionary with the trial judge, and he has been furnished with no objective standards for his guidance, the challenged practice offends due process. . . .").

Contrary to the opinions of two Justices, *Commonwealth v. Schaller,* 493 Pa. 426, 435 n. 11, 426 A.2d 1090, 1095 n. 11 (1981), the *Jones* rule is *clearly* not required by the Constitution. In *Schaller,* the opinion announcing the result of the Court viewed *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) as requiring a charge on voluntary manslaughter in all cases despite the nature of the evidence. This viewpoint was laid to rest by *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) wherein the United States Supreme Court stated: "The Court of Appeals misread our opinion in *Beck.* . . . [D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction. The jury's discretion is thus channelled so that it may convict a defendant of any

crime fairly supported by the evidence." At 611, 102 S.Ct at 2053. The Court in *Hopper* further, contrasted *Roberts v. Louisiana, supra* interpreting that case as "suggest[ing] that an instruction on a lesser offense ... would have been impermissible absent evidence supporting a conviction of a lesser offense." *Id.* Thus, any lingering notion that the *Jones* rule had constitutional underpinnings has been finally dispelled. *See Commonwealth v. Jones, supra* (opinion by Nix, J., in support of affirmance, premising the rule on this Court's supervisory powers).

In a related development, this Court has rejected the practice of charging the jury, on request, on the crime of involuntary manslaughter without regard to the evidence, holding that "charging the jury on extraneous offenses in homicide trials would be inapposite and detrimental to the sound administration of justice." *Commonwealth v. White,* 490 Pa. 179, 184, 415 A.2d 399, 401 (1980), *and Commonwealth v. Williams,* 490 Pa. 187, 415 A.2d 403 (1980). In an appropriate case, this Court would have to consider whether *Roberts v. Louisiana, supra,* would require a similar result regarding instructions on voluntary manslaughter in the absence of evidence to support such an offense.

 Finally, appellant and amici argue that the imposition of the death penalty is inevitably "cruel punishment" under Article I, § 13 of the Pennsylvania Constitution which provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishment inflicted." The argument that capital punishment inevitably violates the prohibition of the Eighth Amendment against "cruel and unusual" punishments has, of course, been foreclosed by the United States Supreme Court. *See Gregg v. Georgia, supra* 428 U.S. at 169, 187, 96 S.Ct. at 2923, 2931. It is requested, however, that this Court interpret Art. I, § 13 as providing broader protection than that guaranteed by the "cruel and unusual punishment" clause of the United States Constitution. We decline the invitation, and hold that the rights secured by the Pennsylvania prohibition against "cruel pun-

ishments" are co-extensive with those secured by the Eighth and Fourteenth Amendments.

It is undisputed that the framers of the United States Constitution did not consider the death penalty to be a *per se* violation of the prohibition against "cruel punishments". *See Gregg v. Georgia, supra* at 177, 96 S.Ct. at 2927.[28] Neither did the framers of the Pennsylvania Constitution. Article I, § 9 enacted simultaneously with Art. I, § 13, provides "nor can [the accused in a criminal prosecution] be deprived of his life, liberty, or property, unless by the judgment of his peers or the law of the land." Similarly, Art. I, § 10 provides "[n]o person shall, for the same offense, be twice put in jeopardy of life or limb ...".

We accept the principle enunciated by the United States Supreme Court that the intention of the framers is not the end point of our analysis, for the Pennsylvania prohibition against "cruel punishment", like its federal counterpart against "cruel and unusual punishment", is not a "static concept. As Mr. Chief Justice Warren said, in an oft-quoted phrase, '[t]he [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Gregg v. Georgia, supra* at 173, 96 S.Ct. at 2925, *quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion). We believe that the most accurate indicators of those "evolving standards of decency" are the enactments of the elected representatives of the people in the legislature. What was stated earlier bears repeating at this juncture: "In considering such an emotionally charged, controversial

---

**28.** Announcing the result of the Court, Mr. Justice Stewart stated: "It is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers. . . . The Fifth Amendment, adopted at the same time as the Eighth, contemplated the continued existence of the capital sanction by imposing certain limits on the prosecution of capital cases:

"No person shall be ... deprived of life, liberty, or property, without due process of law ...."

And the Fourteenth Amendment, adopted over three/quarters of a century later, similarly contemplates the existence of the capital sanction. . . ."

and polarizing issue such as the death penalty, the legislature is peculiarly well-adapted to respond to the consensus of the people of this Commonwealth." *Commonwealth v. Story, supra* 497 Pa. at 297, 440 A.2d at 500 (Larsen, J., dissenting). "[T]he constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Gregg v. Georgia, supra* 428 U.S. at 175–76, 96 S.Ct. at 2926–2927, *quoting Furman v. Georgia, supra,* 408 U.S. at 383, 92 S.Ct. at 2800.

The General Assembly of this Commonwealth has, since its inception, consistently and continually expressed its conviction that the death penalty is, for at least some intentional killings, an appropriate and necessary form of punishment. When the charter was granted William Penn by Charles II in 1681, Penn quickly exercised the privilege granted thereunder to enact laws, and passed statutes in 1682 and 1683 prescribing penalties less than death for all offenses *except* willful or premeditated murder.[29] (Prior to that time, the death penalty was a permissible punishment for a variety of felonies). Even under the so-called "humane laws" of William Penn, therefore, capital punishment was accepted as a necessary and appropriate punishment for willful and premeditated killings. Keedy, *History of the Pennsylvania Statute Creating Degrees of Murder,* 97 U.Pa. L.Rev. 759, 763 (1949) (hereinafter cited as "Keedy"). Immediately upon Penn's death in 1718, the Provincial Assembly repealed these "humane laws" and prescribed the death penalty for, *inter alia,* sodomy, buggery, rape, highway robbery, witchcraft and enchantment. These and other subsequently added offenses, continued to be classified as capital until near the end of the century. *Id.* at 763–64.

**29.** This was the Great Law of William Penn. *Woodson v. North Carolina, supra* 428 U.S. at 290, n. 19, 96 S.Ct. at 2984, n. 19, *citing* Hartung, *Trends in the Use of Capital Punishment,* 284 Annals of Am.Academy of Pol. and Soc.Sci. at 9–10 (1952).

In 1794, the General Assembly approved an act, the first of its kind among the states, creating degrees of murder with the death penalty confined to murder of the first degree encompassing all willful, deliberate and premeditated killings *Keedy, supra* at 772–73; *Woodson v. North Carolina, supra* 428 U.S. at 290, 96 S.Ct. at 2984.[30]

From that time until the present, this Commonwealth has always operated under some legislative enactment setting the penalty for at least some first degree murders at death, except for brief periods caused by decisions of this Court in *Commonwealth v. Bradley, supra, Commonwealth v. Moody, supra,* and *Commonwealth v. McKenna, supra.* The legislature has always acted promptly to fill the gaps caused by those decisions. *See Commonwealth v. McKenna, supra* 476 Pa. at 435, 383 A.2d 174.

Moreover, the legislatures of 34 other states were quick to act in response to *Furman,* and have also concluded that capital punishment is appropriate for at least some crimes that result in the death of another person. *Gregg v. Georgia, supra,* 428 U.S. at 179, 96 S.Ct. at 2928. Combining present acceptance with past usage, *Trop v. Dulles, supra* 356 U.S. at 99, 78 S.Ct. at 597, opined "the death penalty has been observed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty."

The finding that the death penalty is not *per se* "cruel punishment" under Article I, § 13 is implicit in many of our prior decisions. *See, e.g., Commonwealth v. Green,* 396 Pa. 137, 151 A.2d 241 (1959) (death penalty not cruel and unusual punishment under either state or federal constitutions simply because applied to 15 year old defendant, although sentence reduced because lower court failed to consider particularized factors relating to the individual, *not* "from a disinclination against capital punishment") and *Commonwealth v. Howard,* 426 Pa. 305, 231 A.2d 860 (1967) (death

**30.** Following Pennsylvania's lead, many jurisdictions soon followed suit. *Woodson v. North Carolina, supra* 428 U.S. at 290, 96 S.Ct. at 2984.

penalty not cruel and unusual punishment under either state or federal constitutions merely because defendant had been classified as "mentally ill" with borderline or transient psychosis).[31]

For the foregoing reasons, we hold that the death penalty is not "cruel punishment" within the proscription of Art. I, § 13 of the Pennsylvania Constitution, and, further, that the sentencing procedures adopted by the General Assembly and set forth at section 9711 of the Sentencing Code, 42 Pa.C. S.A. § 9711, are permissible under the Constitutions of this state and of the United States. Accordingly, we sustain the conviction of murder of the first degree and affirm the sentence of death.[32]

It is so ordered.

ROBERTS, J., files a dissenting opinion in which O'BRIEN, C.J., joins.

NIX, J., files a dissenting opinion.

ROBERTS, Justice, dissenting.

Although I agree that the jury's verdict of guilty of murder of the first degree should not be disturbed, I do not agree that the judgment of sentence of death is properly affirmed. On this record it cannot be concluded that the Commonwealth has borne its burden of proving, beyond a reasonable doubt, the presence of an aggravating circumstance which would permit the imposition of the death penalty pursuant to 42 Pa.C.S. § 9711(d). Moreover, appel-

31. We will not hesitate, however, to strike down the death penalty where it is grossly out of proportion to the severity of the crime or where it is nothing more than purposeless and needless imposition of pain and suffering. *Gregg v. Georgia, supra* 428 U.S. at 183 and 187–88, 96 S.Ct. at 2929 and 2931–2932; *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (sentence of death is grossly disproportionate and excessive punishment for rape not involving taking of life.)

32. The prothonotary of the Middle District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by this Court to the Governor. 42 Pa.C.S.A. § 9711(i).

lant has not had the opportunity to develop claims challenging the effective assistance of trial counsel, an opportunity afforded through the Post-Conviction Hearing Act to all defendants who receive judgments of sentence other than the death penalty.

## I

Appellant was twenty-five years of age at the time of sentencing. The parties agreed that at least one mitigating circumstance was present in this case: that the defendant had no significant history of prior criminal convictions. See 42 Pa.C.S. § 9711(e)(1). Of the ten aggravating circumstances defined by the Legislature, only one was alleged by the Commonwealth to be present:

> "The victim was a prosecution witness *to a murder or other felony* committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses."

42 Pa.C.S. § 9711(d)(5) (emphasis supplied). On this record it is clear that there is insufficient evidence to establish all necessary elements of this statutorily-defined aggravating circumstance. The Commonwealth's evidence showed only that the victim's name had been read from a list of Commonwealth witnesses at the jury-selection stage of the trial of appellant on felony charges. The Commonwealth presented no evidence as to the nature of the victim's proposed testimony at the felony trial from which the jury could conclude that the victim was "a prosecution witness to a murder or other felony committed by the defendant . . . ."

Under the majority's reading of section 9711(d)(5), the killing of *any* prosecution witness constitutes an aggravating circumstance so long as the witness was killed by the defendant in order to prevent the witness's testimony against the defendant in a felony case. This reading gives effect only to that portion of section 9711(d)(5) requiring the Commonwealth to establish motive; of the remainder of section 9711(d)(5), which requires the victim to have been a

"prosecution witness to a murder or other felony," all but the word "prosecution" has been rendered mere surplusage by the majority.

The majority's determination that section 9711(d)(5) imposes no burden upon the Commonwealth to establish that the victim would have presented eyewitness testimony does not support the majority's conclusion that the killing of *any* prosecution witness constitutes an aggravating circumstance under section 9711(d)(5). Under the majority's reading of section 9711(d)(5), the killing of an expert witness or a witness who provides only a foundation for other testimony would be within the scope of section 9711(d)(5) even though the plain language of section 9711(d)(5) requires that the victim be a "witness to a murder or other felony committed by the defendant." This statutory requirement, easily met in much the same manner as an offer of proof, may not properly be disregarded.

If the Commonwealth had presented evidence which tended to show that the victim would have provided the Commonwealth with a compelling case of circumstantial evidence of appellant's guilt on the felony charges, this Court would be squarely presented with the question of whether the Legislature intended that section 9711(d)(5) should be limited to the killing of eyewitnesses. Where, however, as here, the Commonwealth has presented no proof whatsoever regarding the nature of the victim's testimony, it is evident that the elements of section 9711(d)(5) have not been met. The Commonwealth having failed to meet its burden of proving the presence of an aggravating circumstance, the jury's sentence must be set aside, and a life sentence imposed.

## II

Appellant is represented by the Public Defender of Dauphin County, the same public defender who represented appellant at trial and at the sentencing hearing. Thus far there has been no inquiry into whether appellant has been accorded his constitutional right to the effective assistance

of counsel. A review of the record suggests that counsel's strategy at the sentencing hearing may fairly be questioned: counsel challenged the existence of an aggravating circumstance pursuant to 42 Pa.C.S. § 9711(d)(5) purely on a legal ground, and made no effort to refute the alleged motive for the killing from a factual standpoint.

If this were a conventional case, in which a judgment of sentence other than death were imposed, appellant would be able to challenge the effectiveness of counsel in subsequent proceedings initiated pursuant to the Post-Conviction Hearing Act. Here, the sentence imposed forecloses the availability of those subsequent proceedings. See 42 Pa.C.S. § 9711(i) (record to be transmitted to Governor at close of this Court's review).

Appellant's potential claims of ineffective assistance could conceivably be heard by the federal courts. Yet there is a serious risk that the writs necessary to meaningful federal court review could not be timely obtained. Alternatively, this Court could independently comb the entire record in search of questionable strategies and proceed to determine whether the strategies meet the standard of effective assistance established by our case law, see *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). However, such an approach is essentially a search for "plain and fundamental error," a doctrine abrogated by this Court because of its uneven results and inefficiency. See *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974); *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974). Such an approach also overlooks the fact that frequently the reasons for counsel's strategy do not appear of record, and an evidentiary hearing must be held to ascertain the unknown facts.

Here, the need for a hearing on counsel's effectiveness is critical. There are facts of record which would support a theory that the killing was motivated by financial considerations and not by a desire to prevent the victim from testifying: appellant had incurred a substantial amount of debt before he killed the victim, and appellant was in possession

of a large amount of cash when taken into police custody soon after the killing. Although it is possible that counsel may have had legitimate reasons not to pursue this or any other alternative motive, it is equally possible that counsel's reasons did not serve to advance the interests of appellant, or that counsel simply overlooked relevant evidence. Without an evidentiary hearing, this Court cannot determine whether counsel's course of conduct was constitutionally effective.

Rather than abdicate responsibility to the federal courts, or purport to engage in a search for error on the basis of an incomplete record, this Court should fashion an appropriate procedure which assures proper inquiry into the effectiveness of counsel in death cases. One such procedure would require the appointment of new counsel prior to the direct appeal from a judgment of sentence of death. Newly appointed counsel would be obliged to gather and to evaluate all facts necessary to the determination of whether trial counsel provided the defendant with effective assistance, and then to submit a petition to the court of common pleas in the nature of a petition for post-conviction relief, confined to the question of whether trial counsel was effective. The court of common pleas would conduct an evidentiary hearing on newly appointed counsel's petition and, after making appropriate findings of fact, enter an order which disposes of the petition.

The present record does not permit a full and fair determination of whether appellant was afforded his constitutional right to the effective assistance of trial counsel. Until a hearing on counsel's effectiveness has been held, this Court cannot fairly state that it has discharged its statutory duty to provide a thorough review of the judgment of sentence of death.

O'BRIEN, C.J., joins in this dissenting opinion.

NIX, Justice, dissenting.

I am satisfied that the sanction of capital punishment is not prohibited either by the federal or our state constitution.

I am also convinced that this sanction does provide a significant deterrent effect for those who would consider the perpetration of a deliberate and premeditated murder, even in the absence of a capability to accumulate statistical data in support of this position. Nevertheless, the utilization of this sanction imposes upon the judicial system the responsibility to scrupulously oversee its use and to avoid arbitrary, discriminatory or capricious application. Paramount is the obligation to insure the fairness of the proceeding.

I cannot agree with the majority in its affirmance of the judgment of sentence of death because (1) the statutory standard determining the sentence to be imposed has as yet to be clearly defined and (2) the instructions given by the trial court on this subject were ambiguous and confusing.

The statute has provided that where the jury finds the existence of both aggravating and mitigating factors the sentence of death must be returned if the aggravating circumstances outweigh the mitigating circumstances. 42 Pa.C.S.A. § 9711(c)(iv).[1] The statute has failed to express the standard to be applied in this measurement. The majority implicitly suggests that the scale can be tipped in favor of death by a scintilla of weight. See p. 954, n. 18. I cannot accept the legislature intended the decision of life or death to turn on the weight of a feather.

I recognize a statutory deficiency can be cured by the interpretation of the court of last resort, however, the majority in this instance has failed to come to grips with this question and implies an interpretation that I find to be totally unacceptable. Most importantly for the judgment to stand it must be apparent from the face of the record that the fact finder had before it the proper standard. Here, that obviously was not the case.

1. Although subsection (c)(iv) is ambiguous in that the explicit language states "or if the jury unanimously finds one or more aggravating circumstances which outweigh *any* mitigating circumstances" (Emphasis supplied) it is fair to assume, as the majority properly does, that the word "any" means "all."

In addition to the statutory inadequacy, the record reveals that the charge as it related to this subject was at best ambiguous and unclear. At one point the court told the jury if the mitigating circumstances outweigh the aggravating circumstances the jury must bring in a sentence of life imprisonment. N.T. at 36. Later, the court instructed the jury that the death penalty was required if an aggravating circumstance was found to exist beyond a reasonable doubt and there was either no mitigating circumstance or that the aggravating circumstance outweighed any mitigating circumstance. N.T. 39. This later statement, characterized in the majority opinion at p. 954 as curative, is neither corrective nor curative of the earlier erroneous charge. No mention was made of the fact that the mitigating circumstances need not outweigh the aggravating circumstances. In fact a request for such instructions were specifically refused. We have in the past, in non-capital cases, reversed and granted new trials on the basis of inadequate, unclear, misleading or inappropriate charges. *Commonwealth v. Wortham,* 471 Pa. 243, 248, 369 A.2d 1287, 1290 (1977); *Commonwealth v. Goins,* 457 Pa. 394, 321 A.2d 913 (1974); *Commonwealth v. Tiernan,* 455 Pa. 88, 314 A.2d 310 (1974); *Commonwealth v. Taylor,* 453 Pa. 539, 309 A.2d 367 (1973); *Commonwealth v. Mills,* 350 Pa. 478, 39 A.2d 572 (1944).

> At best, the charge is contradictory, assigning first to one party and then to the other the burden of proving its case. Conceding that in several instances the court correctly assessed upon the Commonwealth the burden of proving guilt beyond a reasonable doubt, nevertheless, the incorrect instructions remained unaltered. The possibility of confusion as a result of conflicting directives may not be permitted on such a fundamental issue as the burden of proof. *See Commonwealth v. Ewell,* 456 Pa. 589, 319 A.2d 153 (1974); *Commonwealth v. Ross,* 266 Pa. 580, 110 A. 327 (1920). The function of the charge is to elucidate the relevant legal principles not to obfuscate them.

> *Commonwealth v. Wortham, supra* 471 Pa. at 247, 369 A.2d at 1289.

84

Here we are faced with a standard of determining life or death, an even more fundamental issue than that of burden of proof.

And finally, it is clearly our responsibility to examine the record with detached scrutiny. The majority opinion not only fails to meet this responsibility, but in my opinion, cavalierly employs a presumption of the absence of harmful error in justifying the charge of the court below.

Accordingly, I join in the affirmance of the conviction of murder of the first degree and would vacate the sentence of death and impose a sentence of life imprisonment.